## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SHASE HOWSE,** | ) | **CASE NO.    1:17 CV 1714** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| | ) | |
| **THOMAS HODOUS, et al.,** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court on the Motions for Summary Judgment filed by

Defendants, Thomas Hodous and Brian Middaugh (Docket #25) and Defendant, City of

Cleveland (Docket #26).

## I.    Factual and Procedural Background.[1]

On July 28, 2016, at approximately 9:00 p.m., Plaintiff, Shase Howse, walked from his

residence at 747 East 102nd Street, Cleveland, Ohio, to a nearby convenience store.  (Affidavit of

Shase Howse at Paragraph 4.)  Mr. Howse alleges that during his walk to the store, he was

---

[1]

    The facts as stated in this Memorandum Opinion and Order are taken from the
Parties' submissions.  Those material facts that are controverted and supported by
deposition testimony, affidavit, or other evidence are stated in the light most favorable to
the non-moving Party.

unlawfully stopped and frisked by Cleveland Police Officers, who have never been identified, but was released without being charged with any crime. He then continued to the store and, following his purchase, walked back home. (Id. at Paragraphs 5-9.)

Around the same time, City of Cleveland Police Detectives Thomas Hodous and Brian Middaugh, members of the City of Cleveland Police Department Gang Impact Unit ("GIU"), were on patrol nearby in an unmarked car. (Deposition of Thomas Hodous ("Hodous Depo.") at p. 26.) Detective Middaugh was in the front passenger seat and Detective Hodous was in the back passenger seat. Detective Colin Ginley was driving, but is not named as a Defendant in this lawsuit (Id. at pp. 26 and 101.) Defendants Hodous and Middaugh testified during deposition that this was a high crime area and that on the evening in question, they were patrolling an ongoing vigil where people routinely congregated and weapons and other contraband had been recovered in the past. Detective Hodous explained that a vigil is a memorial set up at the location of an earlier homicide and, that on this night, people were hanging around the memorial and loitering near the street. (Id. at p. 24.)

The Parties disagree as to whether the Detectives acted reasonably under the circumstances. However, as set forth below, the Parties' recitations of the facts in this case are nearly identical.

**Relevant Facts as Recounted by Mr. Howse.**

In his Affidavit, Mr. Howse states that as he was walking home from the convenience store, he started to look in his pocket for his door key. Mr. Howse was on the phone with his mother at the time and continued talking to her as he climbed the porch steps to his front door. (Howse Affidavit at Paragraphs 12-13.) Mr. Howse states that as he walked across the porch, a

-2-

man in a car on E. 102nd (Detective Middaugh) said something like, "Is this your house?" and Mr. Howse "responded by saying like, 'Yes, this is my house, I live here.'" (Id. at Paragraphs 13-14.) He noticed the man in the car who had questioned him say something to the driver and the car backed up. The man in the car again asked Mr. Howse if that was his house and he responded by saying something like "Yes, what the fuck?" or "Yes, this is my home. What the fuck?" Mr. Howse states that the man in the car "responded by saying something about, 'You have a smart mouth and a bad attitude'" and he continued to make reference to Mr. Howse's "smart mouth." (Id. at Paragraphs 15-18.)

Mr. Howse testified during deposition that Detective Middaugh got out of the car and continued to ask if Mr. Howse lived there. Mr. Howse alleges that Detective Middaugh then told him to put his hands behind his back and that Mr. Howse was "going to jail," to which he responded "no, I live here. I am going home. I am not doing anything." (Howse Depo. at p. 50.) Mr. Howse testified during deposition that he refused to put his hands behind his back. (Id. at pp. 52-53.) Mr. Howse states in his Affidavit, "The men never identified themselves as police officers but ran up the steps to my porch, grabbed me and threw me to the porch floor while I kept yelling that, 'This is my house, I didn't do anything.'" (Howse Affidavit at Paragraphs 20-21.) During his Deposition, Mr. Howse testified that another Police Officer (Detective Hodous) helped Detective Middaugh grab him and put him to the ground. (Howse Depo. at p. 51.)

Mr. Howse states he was "slammed to the floor of the porch and one of the men who I then realized was a police officer was on top of me yelling." (Howse Affidavit at Paragraph 22.) Mr. Howse testified during deposition that when he was on the ground, he resisted the Detectives' efforts to handcuff him by "stiffening up" his body and that he kept trying to tell the

Detectives that he lived there.  (Howse Depo. at pp. 53-54.)  Mr. Howse denies trying to hit or push the Detectives.  Mr. Howse alleges that his head was slammed down onto the porch when he tried to look up when he heard his mother's (Nicholasa Santari) voice, who he testified asked, "What are you all doing?  That's my son."  (Id. at p. 51.)  Mr. Howse alleges Detective Middaugh hit him twice on the neck with his forearm while he was on the ground.  (Id.)  In her Affidavit, Ms. Santari states, "I could see that one of the men struck my son with a closed fist while he was face down which forced his head to strike the porch.  (Affidavit of Nicholasa Santari ("Santari Affidavit") at Paragraph 12.)  Eventually, Mr. Howse was handcuffed, arrested and placed in the rear seat of the police car.  He was extremely upset and his mother tried to calm him down.  (Howse Affidavit at Paragraphs 24-26.)  Mr. Howse testified during deposition that he had identification in his pocket which showed his address, but the Detectives never requested it and he never offered.  (Howse Depo. at p. 52.)

Mr. Howse refused medical treatment at the scene.  Mr. Howse was transported to the City of Cleveland Jail at the Justice Center, placed in a holding cell, and remained in jail over the weekend until his bond was posted.  Mr. Howse did not receive any medical treatment as a result of the events in question.

### Relevant Facts as Recounted by Defendants.

As the Detectives drove past 747 East 102nd Street, Detective Middaugh noticed Mr. Howse on the front porch of a house, near the front door.  Detective Ginley stopped the car and backed up.  Mr. Howse was turned away from the police car.  (Hodous Depo. at pp. 44.)  Detective Hodous testified during deposition that Mr. Howse "appeared nervous when [their] presence became known to him;" that Mr. Howse "immediately turned away from [them], kind

-4-

of glanced back and forth;" and, that Mr. Howse "started reaching in towards near the front of his body near the front door and Detective Hodous could not tell what Mr. Howse was doing." (Hodous Depo. at pp. 49-55.)  At that time, the Detectives did not know Mr. Howse lived at 747 East 102nd Street.  Detective Middaugh testified that believed the house to be vacant because the house was dark; there were bars on the door; and, a garbage can with two boards blocked the driveway.  Detective Middaugh testified that in the dark it also looked as though the doors were boarded up, even though they actually were not.  Detectives Hodous and Middaugh testified during deposition that Mr. Howse lingered on the front porch longer than normal without entering and glanced around nervously as they drove past.  (Deposition of Brian Middaugh ("Middaugh Deposition") at p. 36; Hodous Depo. at pp. 49-50.)

Detective Middaugh asked Mr. Howse if he lived at 747 East 102nd.  Mr. Howse responded yes and turned back around.  The Detectives got out of the car and walked up the steps onto the porch where Mr. Howse was standing to investigate further.[2]  Detective Hodous testified that Detective Middaugh asked Mr. Howse if he was trying to break into the house and Mr. Howse turned and said something to the effect of "Yes, this is my home.  What the fuck?" or "Fuck you.  Leave me the fuck alone."  (Hodous Depo. at p. 64.)  Detective Middaugh testified during deposition that Mr. Howse turned around with clenched fists and Detective Middaugh told him to put his hands in the air, stating that the believed Mr. Howse wanted to fight him.  (Middaugh Depo. at p. 53.)  Mr. Howse did not comply.  (Hodous Depo. at p. 71.)  Detective Hodous testified that Mr. Howse "started motioning towards his pockets."  (Id. at p. 80.)

---

[2]

   Other Officers were at the scene but, aside from Sergeant Matthew Putnam who assisted Detectives Hodous and Middaugh, the other officers were otherwise uninvolved.

After he refused orders to keep his hands up, Detective Middaugh grabbed Mr. Howse's left arm and Detective Hodous grabbed Mr. Howse's right arm. (Hodous Depo. at p. 82.) Detective Middaugh testified that Mr. Howse was "grabbing" at them and "ripping" on them and that they "just wanted him to calm down." Detective Hodous testified that when he grabbed Mr. Howse's right arm, Mr. Howse pulled his arm away and struck him in the chest with his right open hand. (Hodous Depo. at p. 80.) Detective Hodous "attempted to regain control of [Mr. Howse's] hands" as Mr. Howse broke Detective Hodous's "flashlight holder off of his vest trying to pull [Detective Hodous] to the ground." (Hodous Depo. at pp. 82-83.) Detective Hodous stated, "he pulled away from us and struck us both." (Hodous Depo. at p. 84.) Detective Hodous continued, "We were just going in circles trying to get his hands and he was just flailing his arms around. And then Detective Middaugh then took him to the ground. (Hodous Depo. at p. 83.)

Detective Middaugh testified, "I thought I could resolve it easier than that, but when he starts pulling my handcuff case off and my flashlight and he's flailing around, I had no choice at that point, I decided, 'Man, let's just do a leg sweep, take him to the ground, put him in handcuffs, and be done with it.'" (Middaugh Depo. at pp. 59-60.) He testified, "[W]e're literally holding him while he's flailing and pushing and jerking and screaming for I don't – I can't give you exact seconds, but I mean, we waited as long as I felt like we could before we had – personally, I did, I made that decision to sweep his leg, before we had to take him to the ground." (Id. at p. 99.) Detective Middaugh then did a "leg sweep" and Mr. Howse was taken to the ground and handcuffed. (Id. at pp. 54-60.) Detective Middaugh testified, "So I just feel like it's just really important that you know that we didn't just walk up there, grab this kid, and slam

-6-

him on the ground.  We waited as long as humanly possible before he went to the ground.  We're

holding his arms and I feel like that delay is really important to just show that listen, I'm not

trying to be a bad guy here, but I'm scared of guns.  I want to go home."  (Id. at p. 100.)

Detective Middaugh testified that they "were trying to use the absolute minimal amount

of force to get this kid to just comply with we're doing.  All we wanted to do is check and make

sure he lives there and that he doesn't have a weapon."  (Id. at p. 59.)  Detective Hodous

testified, "I do not recall if Middaugh was on top of him.  I know that we were trying to free his

arms from underneath his body.  At that time, he had buried his hands underneath his chest and

was kicking his feet not allowing us to place him in handcuffs.  (Hodous Depo. at p. 85.)  Mr.

Howse's mother, Ms. Santari, arrived on the scene and asked, "What's going on here?" and

confirmed that she and Mr. Howse lived in the house.  (Middaugh Depo. at p. 60; Hodous Depo.

at p. 86.)  Detective Middaugh placed Mr. Howse in the police car.  He was swearing and upset.

He was ultimately transported to the police department and booked.

**Use of Force Reports.**

"Use of Force Reports" were completed by Detectives Hodous and Middaugh, as well as

Sergeant Matthew Putnam, who was also on the scene and assisted handcuffing Mr. Howse.

Sergeant Donald Robinson was assigned to investigate.

Detective Hodous stated as follows with regard to the use of force against Mr. Howse:

On July 28, 2016, at approximately 2155 hrs., and at the location of 747 E.102
St., I assisted Detective Middaugh #2128, with confronting a male, later identified
as Shase Howse, who was on the front porch of the above location. Howse
became extremely irate and would not listen to verbal commands, as he motioned
his hands towards his pockets. It was at this time I grabbed Howse's right arm, to
keep him from going into his pocket. Howse then pulled his right arm away and

-7-

attempted to push me backwards, striking me in the chest with an opened right hand. I then grabbed and attempted to control Howse's right arm as he attempted to strike me further. During the struggle, Howse grabbed and ripped the flashlight off of my tactical vest. Howse was then taken to the ground by Detective Middaugh, where I assisted in handcuffing him.

(Docket #37-2.) Reporting types of resistance used by Mr. Howse against him, Detective

Hodous listed, "Push;" "Feet/Leg Kick/Knee;" "Open Hand Strike;" "Pull;" and, "Resist

Handcuffing." (Id.) Reporting the force used against Mr. Howse, Detective Hodous stated,

"Control Hold-Restraint." (Id.)

Detective Middaugh stated as follows in his Use of Force Report:

On July 27, 2016, at 2155 hrs., at 747 E.. 102 while assigned to the Gang Impact Unit in company with Detective Hodous #2451, Detective Ginley #2222, Detective Mobley #47, Detective Skernivitz #2249, and under the direct supervision of Sgt. Putnam we had the occasion to arrest Shase Howse for Assault on a P.O. The following are the facts of the arrest.

On this day detectives were assigned to the fifth district in connection with a recent uptick in felonious assault shootings. Detectives were patrolling the area of E. 102 just south of St. Clair where a visual was being held for someone who had been murdered. In the past GIU Detectives have patrolled visuals of murder victims because people are known to carry firearms at these visuals in connection with gang related shootings. GIU detectives have also investigated drive by shootings at visuals. As recently as yesterday GIU Detectives recovered an illegally possessed firearm from a visual.

After passing the visual N/B we passed the address of 747 E. 102 and observed a male, (Shase Howse),standing on the front porch. At this time I believed the house was vacant, the driveway had boards blocking it, and I believed the doors were boarded up. While passing, Howse looked towards our car and then looked away quickly as if we startled him. We then stopped and reversed and Howse began looking back and forth. Based on training and experience this is commonly what a person does right before he or she run from police. It appeared as though he was scanning the area for a exit route. Detective Hodous and I exited the Detective car and I asked Howse if he lived there. He responded that he did, and looked away back towards the door, he appeared to have his hands on the door but was not opening it. At this point I was in fear that Howse was either trying to break into this house, or conceal something in front of his person. I then asked him if he was breaking in and he stated "fuck", and then

-8-

something else that I could not understand. As I approached I asked him what he said and he turned around and did not respond. He immediately took a fighting stance and clenched his fist. I then told him to put his hands up and he refused and motioned his hands down towards his pockets. I then grabbed his left hand and Det. Hodous grabbed his right arm fearing he may be grabbing for a weapon. He then pushed Detective Hodous and I simultaneously, striking me with his left hand in the chest, and Det. Hodous with his right hand in the chest. Detective Hodous and I attempted to control Howse by holding his arms but he began grabbing our vests, and kicking his legs.  Howse ripped my handcuff case off my vest, and ripped my flashlight off my vest with his left hand while attempting to pull me down. He also pulled Det. Hodous' flashlight off his vest while he was trying attempting to pull Det. Hodous to the ground. At this point I performed a leg sweep on Howse and used balance displacement to take him to the ground. He then went to his stomach and continued kicking his legs and holding his arms under his chest. While giving repeated commands to put his arms behind his back and stop displacement to take him to the ground. He then went to his stomach and continued kicking his legs and holding his arms under his chest. While giving repeated commands to put his arms behind his back and stop kicking Howse refused and continued making growling noises. At this point Sgt. Putnam, Det. Hodous and I pulled Howse's arms behind his back and placed him in handcuffs. He was then escorted to the rear of the Detective car where Sgt. Putnam asked Howse if he was ok, or if he needed EMS. Howse responded he did not.

While this was taking place Howse's mother, Nicholasa Santari, arrived on scene. She told us that Howse had just moved in with her at this address and she has had several problems with him and his temper issues. She stated that he was in several psychiatric programs in school growing up but has not been treated since he was 18 years of age because at that age it became optional and not mandatory. Santari could not remember what Howse had been diagnosed with.

(Docket# 37-4.)  With regard to the type of resistance Mr. Howse used against him, Detective

Middaugh listed, "Feet/Leg Kick/Knee;" "Bodyweight;" "Open Hand Strike;" "Punch/Elbow;"

and, "Push."  With regard to the type of force he used against Mr. Howse, Detective Middaugh

listed, "Feet/Leg Sweep;" "Tackling/Takedown;" and, "Control Hold-Restraint."  (Id.)

Sergeant Matthew Putnam stated as follows in his Use of Force Report:

I assisted in the handcuffing of Shase Howse by pulling his right arm from underneath him and bringing it behind his back. The male was thrashing about, refusing multiple verbal commands to place his hands behind his back. The male

was being detained by Det. Middaugh on suspicion of breaking and entering into an abandoned home. Howse kicked his legs and pinned his arms underneath his body to prevent cuffing.

(Docket #37-3.)  With regard to type of resistance Mr. Howse used against him, Sergeant Putnam stated, "Resist Handcuffing."  With the type of force used against Mr. Howse, Sergeant Putnam stated, "Pull."(Id.)

Regarding his investigation, Sergeant Donald Robinson stated, in relevant part, as follows:

> Detectives Middaugh #2128 and Hodous #2451 confronted a male on the porch who appeared to be breaking into a vacant house. As both detectives approached (Shase Howse), (Howse) became belligerent with detectives upon being questioned if he lived there. (Howse) took a fighting stance, began to growl and direct profanity toward detectives. Both detectives while attempting to control the situation, believing (Howse) may be concealing a weapon, took him to the ground and attempted to handcuff him while he was kicking and pinned his arms beneath him. Sgt. Putnam then assisted by pulling (Howse) right arm from under him, used joint manipulation and help handcuff (Howse). At this time, while utilizing my WCS, I interviewed (Howse) and asked him what happened. (Howse) stated he was approached by the detectives and questioned if he lived lived [sic] at above location. He further stated he was upset about being harassed and that's why he acted in the manner in which he did. (Howse) was not injured as a result of this incident. I observed no signs of injuries and EMS was refused. Taking all interviews and statements into account, [the Detectives'] actions were appropriate and well within divisional guidelines. I recommend no further action taken.

(Docket #s 37-2 to 37-4.)  Each Use of Force Report was reviewed by a combination of several members of the Cleveland Police Department – including Lietuenant Patricia Murphy; Commander Dennis Hill; Deputy Chief Reviewing Sergeant Joseph Hageman; Chief Reviewing Sergeant Anthony Gorsek; and, Deputy Chief Dornat Drummond – and all found the Detectives' uses of force to be reasonable, within divisional guidelines and recommended no further action.

(Id.)

Mr. Howse argues that he and his mother should have been interviewed regarding the

Detectives' use of force and that the City never investigated the earlier stop and frisk of Mr.

Howse by unknown Cleveland police officers prior to the events involving Detectives Hodous

and Middaugh.

**Indictment; Citizen Complaint; Dismissal of Charges.**

On July 28, 2016, Detective Middaugh signed a Complaint against Mr. Howse charging

him with Assault on a Police Officer.  (Docket #29-5)  On September 7, 2016, Mr. Howse was

indicted by a Cuyahoga County Grand Jury on two felony counts of Assault on a Police Officer

in violation of Ohio Revised Code § 2903.13(A) and one count of Obstructing Official Business

in violation of Ohio Revised Code § 2921.31(A).  (Docket #25-4.)

On September 9, 2016, Mr. Howse filed a Citizen Complaint Form.  (Docket #29-9.)

Mr. Howse stated as follows:

> While standing on the porch of my home at 747 E. 102nd St., Cleveland Police
> came on to my property, threw me to the floor and commenced striking me.  I
> repeatedly explained that this was my house but they ignored my explanations and
> arrested me for assault on a police officer and obstructing official business.

Mr. Howse indicated that he sought, "Dismissal of charges, training relative to racial profiling,

public apology and payment of compensatory damages."  (Id.)  Mr. Howse alleges that the Office

of Professional Standards has taken no action to investigate Mr. Howse's Citizen Complaint.

On October 4, 2016, all charges against Mr. Howse were dismissed by the Prosecutor at

the recommendation of Detective Middaugh.  Detective Middaugh testified during deposition

-11-

that he spoke with Ms. Santari about Mr. Howse's mental health and understood "the fact that he may or may not have been stopped before" that same evening.  Detective Middaugh stated, I just kind of felt like this was an opportunity to give this kid a second change and do something right. I don't want to mar his record with a felony."  (Middaugh Depo. at p. 93.)

## II.    The Complaint.

On July 21, 2017, Mr. Howse filed his Complaint in the Cuyahoga County Court of Common Pleas.  The case was removed to this Court on August 16, 2017.  Mr. Howse alleges claims against all Defendants under 42 U.S.C. § 1983 for excessive force and malicious prosecution, and against Detectives Hodous and Middaugh under 42 U.S.C. § 1983 for assault and battery.

Mr. Howse's Complaint includes statements regarding the City's alleged failures in training, investigation and discipline, and relates those to the Constitutional violations alleged by Mr. Howse.  In his Brief in Opposition to the City's Motion for Summary Judgment, Mr. Howse states, "Also named is the City of Cleveland based on the City's utilizing a custom or practice of failing to properly investigate incidents involving the improper use of force by police officers employed by the City of Cleveland and to shield police officers from their unconstitutional behavior." "Basically, Plaintiff contends that the City's polices, although facially neutral, were utilized to deny him his constitutional rights which was well-documented in a 2014 investigation report issued by the U.S. Department of Justice." Mr. Howse alleges that the City's investigation into the Officers' use of force in this case was insufficient and that the City had a pattern or practice of inadequately investigating use of force claims in order to shield the Detectives from liability.  (Docket #33 at pp. 9-12.)

-12-

## III.    Motions for Summary Judgment.

Defendants filed their Motions for Summary Judgment on November 20, 2018. (Docket #s 25 and 26.) Detectives Hodous and Middaugh argue that they are entitled to qualified and/or statutory immunity as to all of Mr. Howse's claims and that Mr. Howse has otherwise failed to present evidence sufficient to withstand summary judgment. The City of Cleveland argues that Mr. Howse has failed to assert any valid claim against the City.

Mr. Howse filed Opposition Briefs on December 20, 2018 (Docket #29) and January 4, 2019 (Docket #33). Defendants filed Reply Briefs on January 17, 2019 (Docket #36) and January 18, 2019 (Docket #37). Defendants' Motions are fully briefed and ripe for review.

## IV.    Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most

-13-

favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to

-14-

examine "[o]nly disputes over facts that might affect the outcome of the suit under governing

law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it

weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole

function is to determine whether there is a genuine factual issue for trial; this does not exist

unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining

whether there is the need for a trial--whether, in other words, there are any genuine factual issues

that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." *Anderson*, 477 U.S. at 250.

## V.     Discussion.

In order to prevail on a claim brought pursuant to § 1983, a plaintiff must establish by a

preponderance of the evidence that a person acting under the color of law deprived him of a right

secured by the United States Constitution or the laws of the United States. *Smoak v. Hall*, 460

F.3d 768, 777 (6th Cir. Tenn. 2006).  A violation of § 1983 must be intentional or knowingly

committed in order to be compensable.  A negligent or reckless deprivation is not sufficient.

*Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. Mich. 1999).  Further, an injury caused by mere

negligence, that does not rise to the level of a constitutionally protected interest is not

compensable under §1983.  *See Collins v. City of Shaker Heights*, 503 U.S. 115 (1992).

Government officials are protected from liability for civil damages, including those that

arise under §1983, "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*,

-15-

555 U.S. 223, 231 (2009).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

To determine whether qualified immunity applies in a given case, we use a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. Ohio 2012); see also *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  We can consider these steps in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Local governments may not be sued under 42 U.S.C. § 1983 for an injury inflicted solely by employees or agents under a respondeat superior theory of liability.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  A municipality can, therefore, be held liable when it unconstitutionally "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690; see also *DePiero v. City of Macedonia*, 180 F.3d 770, 786 (6th Cir. Ohio 1999).  A plaintiff must prove (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. Tenn.

-16-

2005).

Employees of a political subdivision also enjoy immunity from certain claims pursuant to Ohio Rev. Code § 2744.03(A)(6). That section provides immunity to a city employee from "a civil action brought . . . to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function," unless the employee acted outside the scope of his employment, acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," or unless "liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6)(a)-(c).

"Malicious purpose encompasses exercising 'malice,' which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 136 Ohio App.3d 616, 620, 737 N.E.2d 563 (Ohio Ct. App. 2000) (citing *Jackson v. Butler Cty. Bd. of Cty. Comm'rs.*, 76 Ohio App.3d 448, 453-454, 602 N.E.2d 363 (Ohio Ct. App. 1991)). An act is committed recklessly if it is done "with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent." *Caruso*, 136 Ohio App. 3d at 621 (citing *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 771, 663 N.E.2d 384 (Ohio Ct. App. 1995)).

### A. Excessive Force.

The Fourth Amendment provides that "the right of the people to be secure in their

-17-

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The United States Supreme Court has held that an officer may conduct an investigatory stop without the probable cause needed for an arrest where the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing might be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In addition, an investigatory stop, or Terry stop, is not unreasonable if the detention lasts no longer than necessary to effectuate the purpose of the seizure. *United States v. Perez*, 440 F.3d 363, 369-70 (6th Cir. Tenn. 2006).

Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard encompasses "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. Ohio 2002) (citing *Graham*, 490 U.S. at 396). It "allow[s] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "An officer should be entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances with which he was faced." *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 175 (6th Cir. Mich. 2004) (citation omitted). The factors considered in assessing a constitutional excessive force claim include the particular facts and circumstances of each case, the severity of the crime, the threat posed by the suspect, and whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The

-18-

'reasonableness' of the particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Mr. Howse argues that he was unlawfully detained by Detectives Hodous and Middaugh on the evening of July 28, 2016 and that the force used during his detention by Detectives Hodous and Middaugh was excessive. The facts relevant to this inquiry are not in dispute. The Detectives observed Mr. Howse on the front porch of what they mistakenly believed to be a vacant home in a high crime area. They stopped and questioned Mr. Howse, who failed to comply with Detectives' requests and actively resisted their attempts to secure him. The Detectives used force no greater than that necessary to control the situation. Considering the totality of the circumstances, the Detectives' conduct was objectively reasonable and Detectives Hodous and Middaugh are entitled to qualified immunity as to Mr. Howse's excessive force claim.

### B.    Malicious Prosecution.

Mr. Howse alleges that Defendants violated his right to be free from malicious prosecution without reasonable suspicion or probable cause, in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. Mr. Howse argues that "Defendants initiated the criminal prosecution by initially assaulting, battering and arresting him without probable cause or reasonable suspicion and, thereafter, prepared a fictitious report in an attempt to justify their action which was just to obtain flawed indictments."

A malicious prosecution claim requires a plaintiff prove that: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the

decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Gradisher v. City of Akron*, 794 F.3d 574 (6th Cir. Ohio 2015).   Ordinarily, an officer cannot be held liable for malicious prosecution if he did not make the decision to prosecute. *Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. Mich. 2002).

In most cases, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. Ky. 2002).  But the Sixth Circuit has recognized an exception to this rule for cases where the defendant who set the plaintiff's prosecution in motion knowingly or recklessly made a false statement. The otherwise conclusive presumption becomes rebuttable when:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury)[.]

*King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. Ky. 2017).

As stated above, the Court finds that the Detectives' conduct during the events in question was objectively reasonable and that the amount of force used was not excessive.  Mr. Howse resisted the Detectives' directives and their attempts to secure his arms; the Detectives had probable cause to arrest Mr. Howse; and, the undisputed facts were sufficient to support the

charges filed against him. Mr. Howse was indicted by a properly constituted Grand Jury and there is no evidence that Detectives Hodous or Middaugh knowingly, recklessly or maliciously made false statements or fabricated evidence. Accordingly, Detectives Hodous and Middaugh are entitled to summary judgment as to Mr. Howse's malicious prosecution claim.

## C. Assault and Battery.

"'If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery ....'" *D'Agostino v. City of Warren,* 75 Appx. 990, 995 (6th Cir. Ohio 2003) (quoting *City of Cincinnati v. Nelson*, Case No. C-74321, 1975 Ohio App. LEXIS 7443, * 5 (May 5, 1975) (citing 5 O Jur (2d) ARREST §§ 50) (unpublished); see also *Schweder v. Baratko*, 103 Ohio App. 399, 403, 143 N.E.2d 486 (1957) ("Force when used lawfully in making an arrest is in the exercise of a government function, and only in cases where excessive force is used, that is, force going clearly beyond that which is reasonably necessary to make the arrest, can such force be claimed an assault and battery by the person arrested."). As stated above, an officer, acting in his official capacity, is immune from liability for injury unless his actions were "manifestly outside the scope" of his responsibilities, or the officer acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code. § 2744.03(A)(6).

As set forth above, the force used to effectuate Mr. Howse's arrest when he failed to comply with the Detectives' directives and actively resisted their attempts to control him was not excessive and there is no evidence by which a jury could find the Detectives acted with malicious purpose, in bad faith, or in a wanton or reckless manner. Accordingly, Detectives Hodous and Middaugh are entitled to summary judgment as to Mr. Howse's excessive force

claim.

**D.      Defendant City of Cleveland.**

Regarding municipal liability under § 1983, the Supreme Court has held that if the officer inflicted no constitutional injury on a person, then it is "inconceivable" that the City could be liable to the person. *DeMerrell v. City of Cheboygan,* 206 Fed. Appx. 418, 429 (6th Cir. Mich. 2006) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)(per curiam)). If "a person has suffered no constitutional injury at the hands of the individual police officer, the fact that department regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799. The failure to establish a constitutional injury inflicted by Detective Hodous and Middaugh renders Mr. Howse's claims against the City meritless. Accordingly, the City is entitled to summary judgment as a matter of law.[3]

---

[3]

      Mr. Howse offers the expert opinion of Charles Stephenson, who concluded that the Cleveland Police Department's Gang Impact Unit selectively enforces loitering ordinances to aggressively approach individuals so that it may "sidestep probable cause guidelines to warrant aggressive stop and frisk activities," and that these actions are condoned, encouraged and rewarded by the Cleveland Police Department. Mr. Stephenson relies upon the December 4, 2014 Report by the U.S. Department of Justice on the use of force by the Cleveland Police Department, which followed an investigation by the DOJ and the Civil Rights Division of the U.S. Attorney's Office for the Northern District of Ohio in response to a series of prominent incidents involving the excessive use of force by the CPD. Mr. Howse cannot rely upon the DOJ Report and subsequent Consent Decree to establish his *Monell* claim. *Lopez v. City of Cleveland,* Case No. 1:13 CV 1930, 2016 U.S. Dist. LEXIS 26028 (N.D. Ohio March 1, 2016). Furthermore, while there was testimony regarding a vigil in the area earlier, the undisputed testimony reflects that Mr. Howse was questioned and approached by the Detectives based on their mistaken belief he was trying to enter a vacant home, not for loitering. As stated above, the Parties in this case agree on the facts relevant to the disposition of Mr. Howse's claims and there is no evidence of record to support Mr. Stephenson's opinion that the Detectives "made a conscious decision to create and fabricate a probable cause scenario

**VI.    Conclusion.**

For the foregoing reasons, the Motions for Summary Judgment filed by Defendants,

Thomas Hodous and Brian Middaugh (Docket #25) and Defendant, City of Cleveland (Docket

#26) are hereby GRANTED.

Each party shall be responsible for their own attorney fees and costs.

This case is hereby TERMINATED.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
Senior United States District Judge

DATED: April 5, 2019

_____

in their Use of Force reports" or that official policy or custom existed within the City of
Cleveland or its Police Department which resulted in any injury to Mr. Howse.

-23-